## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| **v.** | : **3:15-CR-155** |
| | : **(JUDGE MARIANI)** |
| **DENNIS LANGLEY, JR.,** | : |
| | : |
| **Defendant.** | : |

### MEMORANDUM OPINION

#### I. INTRODUCTION

Presently before the Court is Defendant's Motion to Suppress Evidence and

Statements, (Doc. 25). Defendant, Dennis Langley, Jr., is charged with a single count of

possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a). On October

23, 2016, Defendant filed this Motion seeking to suppress all physical evidence and

statements that were obtained by police as a result of a July 6, 2015, traffic stop. The

Motion has been fully briefed and an evidentiary hearing was held on July 25, 2017. For the

reasons that follow, this Court will deny Defendant's Motion to Suppress Evidence and

Statements.

#### II. BACKGROUND

On the evening of July 6, 2015, Officer Michael Sampere of the Stroud Area

Regional Police Department was dispatched to a welfare check in Monroe County,

Pennsylvania. (7/25/17 Hr'g Tr., Doc. 35 at 4, 9-10). Officer Sampere proceeded in a

marked police cruiser onto Interstate 80 en route to the call. (*Id.* at 9-10). Encountering

moderate traffic, Officer Sampere moved behind a black Dodge Charger which was traveling in the left lane of the two westbound lanes. (*Id.* at 11-12). Soon thereafter, traffic thinned and the right lane became clear of vehicles. (*Id.* at 13). Nevertheless, the Dodge Charger did not move into the right lane. (*Id.*). After traveling another half mile and wanting to pass the Dodge Charger, Officer Sampere attempted to get the driver's attention by sounding his vehicle's air horn two to three times. (*Id.* at 15, 60). When that did not get the driver's attention, Officer Sampere activated the police vehicle's sirens two to three times and motioned for the driver to move to the right. (*Id.* at 15-16). After receiving no response from the driver, Officer Sampere pulled the vehicle over at 7:48 p.m. (*Id.* at 17, 47; Gov't Ex. 3).

Once both vehicles were on the side of the road, Officer Sampere approached the Dodge Charger and saw that Defendant was the sole occupant. (7/25/17 Hr'g Tr., Doc. 35 at 18). Officer Sampere asked Defendant for his license, vehicle registration, and insurance information. (*Id.* at 19). Defendant produced a valid license and an Enterprise rental agreement and told the officer that he had just dropped his girlfriend off in Clifton, New Jersey, and was on his way to visit family in Syracuse, New York. (*Id.* at 19-22; Gov't Ex. 1). When Officer Sampere asked what specific family member he was going to visit, Defendant was unable to answer. (7/25/17 Hr'g Tr., Doc. 35 at 22). At this time, Officer Sampere also noted that Defendant had a smart phone on his lap and a flip phone in the car's center console. (*Id.* at 20).

2

Officer Sampere went back to his vehicle and began to run Defendant's driver's license. (*Id*. at 23). At 7:49 p.m. Officer Sampere used his cell phone to call the car rental company to confirm the validity of the rental agreement. (*Id*. at 24, 50; Gov't Ex. 4). While still on the phone with Enterprise, Officer Sampere began running a criminal history check on Defendant and writing out a traffic citation. (7/25/17 Hr'g Tr., Doc. 35 at 26). The criminal history check revealed that Defendant had prior felony drug convictions and a prior weapon related arrest. (*Id*. at 27). At 7:53 p.m., Officer Sampere requested back up and a canine unit. (*Id*. at 47-48; Gov't Ex. 3). Soon thereafter, Officer Sampere's call with Enterprise got disconnected and the officer had to call again. (7/25/17 Hr'g Tr., Doc. 35 at 24-25, 50; Gov't Ex. 4). At approximately 8:16 p.m., Officer Sampere confirmed with Enterprise that the rental agreement was valid. (7/25/17 Hr'g Tr., Doc. 35 at 25; Gov't Ex. 4). Around this same time, he was informed that the State Police's canine units were unavailable. (7/25/17 Hr'g Tr., Doc. 35 at 29, 48; Gov't Ex. 3). Officer Sampere then contacted a nearby police department and was told that one of their dogs was available. (7/25/17 Hr'g Tr., Doc. 35 at 29-30, 48, 50-51; Gov't Ex. 3, 4).

After completing the citation, Officer Sampere reapproached Defendant in the vehicle. (7/25/17 Hr'g Tr., Doc. 35 at 31). The officer returned Defendant's documents and began to explain the citation. (*Id*. at 32). Officer Sampere then, for a second time, asked Defendant what family member he was visiting in Syracuse. (*Id*. at 33). Once again, Defendant did not have an answer. (*Id*. at 33-34). The officer then issued Defendant the

3

citation for violation of 75 Pa. C.S. § 3301(a), driving on the left side of the roadway without passing. (Id. at 32, 34; Gov't Ex. 2). After breaking off contact for a moment, Officer Sampere reengaged Defendant, asked him a few more questions, and then asked for permission to search the vehicle. (7/25/17 Hr'g Tr., Doc. 35 at 34-35, 68). Defendant did not consent to the search, at which point Officer Sampere asked Defendant to step out of the vehicle. (Id. at 36). Officer Sampere moved Defendant off the roadway, patted him down, and had him sit on a guard rail. (Id. at 36-37). While this happened, at approximately 8:32 p.m., Officer Nero of the Pocono Mountain Regional Police Department arrived on scene with his dog. (Id. at 38, 48-49; Gov't Ex. 3).

Soon thereafter, Officer Nero brought his dog around the car and the dog alerted, indicating the presence of narcotics. (7/25/17 Hr'g Tr., Doc. 35 at 39-40). Officer Sampere then decided to seize the vehicle and apply for a search warrant. (Id. at 40). At 8:53 p.m., the officer called Defendant a taxi cab. (Id. at 40, 49; Gov't Ex. 3). A half an hour later it was determined that the taxi was taking too long, at which point another officer drove Defendant to a nearby hotel. (7/25/17 Hr'g Tr., Doc. 35 at 40-41, 49; Gov't Ex. 3). The car was then brought to the police station and impounded. (7/25/17 Hr'g Tr., Doc. 35 at 41-42). The next day, Officer Sampere applied for and received a search warrant for the vehicle. (Id. at 42). A search of the car uncovered over 10,000 individual bags which combined contained over 300 grams of a substance believed to be heroin. (Id. at 42-45).

4

## III. STANDARD OF REVIEW

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures." U.S. CONST. amend. IV. "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## IV. DISCUSSION

Defendant raises a variety of arguments as to why the initial traffic stop and the subsequent conduct of the police in this case violated his Fourth Amendment rights. The Court will address each argument in turn.

### A. Initial Traffic Stop

Defendant first argues that Officer Sampere violated his rights under the Fourth Amendment when the officer stopped Defendant's car for an alleged violation of 75 Pa. C.S. § 3301(a). (Doc. 25 at 12-14). Specifically, Defendant contends that Officer Sampere lacked the requisite level of suspicion required to render the stop constitutionally permissible. It is beyond dispute "that stopping a car and detaining its occupants is a seizure under the Fourth Amendment." *Johnson*, 63 F.3d at 245. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based

5

on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)). Accordingly, "[a] routine traffic stop is constitutional when it is supported by reasonable suspicion." *United States v. Gooch*, 915 F. Supp. 2d 690, 702 (W.D. Pa. 2012); *see also United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (holding that the "reasonable suspicion standard applies to routine traffic stops"). "Where reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237.

Initially, Defendant argues that, under *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002), the lawfulness of a traffic stop is evaluated under the law of the state in which the stop occurred. (Doc. 25 at 13). Defendant contends that, under Pennsylvania law, a police officer is required to possess probable cause before stopping a vehicle for a violation of 75 Pa. C.S. § 3301(a) and thus any stop in Pennsylvania predicated on less than probable cause is constitutionally invalid. (Doc. 25 at 13). Defendant is correct that courts in Pennsylvania have found that "some offenses, by their very nature, require a police officer to possess probable cause before he or she may conduct a traffic stop." *Commonwealth v. Ibrahim*, 127 A.3d 819, 823 (Pa. Super. Ct. 2015). Thus, Pennsylvania

has created a two tier system for traffic stops. The Pennsylvania Supreme Court has explained that "if the officer has a legitimate expectation of investigatory results, the existence of reasonable suspicion will allow the stop—if the officer has no such expectations of learning additional relevant information concerning the suspected criminal activity, the stop cannot be constitutionally permitted on the basis of mere suspicion." *Commonwealth v. Chase*, 960 A.2d 108, 115 (Pa. 2008). For traffic offenses falling into the latter category, the Court explained, "[a]n officer must have probable cause to make a constitutional vehicle stop." *Id.* at 116. With respect to the offence at issue in this case, Pennsylvania courts have held that a police officer must have probable cause to believe a violation of 75 Pa. C.S. § 3301(a) has occurred before initiating a traffic stop. *See, e.g., Commonwealth v. Enick*, 70 A.3d 843, 846 (Pa. Super. Ct. 2013).

Nevertheless, federal courts within the Third Circuit have not utilized a two tier system like the one in use in Pennsylvania. Instead, federal courts within this circuit have repeatedly held that a police officer does not offend the Constitution when he or she initiates a traffic stop based on reasonable suspicion that a violation of the applicable traffic code has occurred. *See, e.g., Delfin-Colina*, 464 F.3d at 397; *Lewis*, 672 F.3d at 237; *United States v. Mosley*, 454 F.3d 249, 255 n.9 (3d Cir. 2006) ("A traffic stop requires only reasonable suspicion to believe that a traffic violation has been committed"); *Gooch*, 915 F. Supp. 2d at 702-03 n. 7 (noting that the appropriate standard for assessing the constitutionality of a traffic stop is reasonable suspicion and not probable cause).

7

Defendant's reliance on *Myers* for the proposition that certain traffic stops in

Pennsylvania must be based on probable cause to be constitutionally permissible is

misplaced for two reasons. First, *Myers* stands for the proposition that "[t]he validity of an

*arrest* is determined by the law of the state where the *arrest* occurred." *Myers*, 308 F.3d at

255 (emphasis added). Notably, however, *Myers* does not address the requisite level of

suspicion required to conduct a traffic stop.

Second, Defendant reads *Myers* too broadly. Defendant argues that, under *Myers*,

"[i]f an officer lacks the power to make an arrest under state statute, then an arrest is

unconstitutional as well, even if it might otherwise be permitted by the constitution." (Doc.

25 at 13). This interpretation of the Fourth Amendment was squarely rejected by the

Supreme Court in *Virginia v. Moore*, 553 U.S. 164, 128 S. Ct. 1598, 170 L. Ed. 2d 559

(2008). In *Moore*, the Supreme Court held that an arrest of a driver based on probable

cause that he was driving on a suspended license did not violate the Constitution even

though state law did not permit the officer to make an arrest in such circumstances. *Id*. at

166-67, 176. The Court noted that it had never "held that violations of state arrest law are

also violations of the Fourth Amendment, and [the Court's] more recent decisions . . . have

indicated that when States go above the Fourth Amendment minimum, the Constitution's

protections concerning search and seizure remain the same." *Id*. at 173. Thus, the Court

held that "warrantless arrests for crimes committed in the presence of an arresting officer

are reasonable under the Constitution, and that while States are free to regulate such

8

arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 176. Accordingly, even assuming *Myers* applies to the case at hand, that decision does not require this Court to apply Pennsylvania's two tier system for traffic stops.

Accordingly, even though a Pennsylvania court may have held that Officer Sampere required probable cause to pull Defendant over for a violation of 75 Pa. C.S. § 3301(a), the traffic stop does not offend the Fourth Amendment—as interpreted by federal courts—as long as Officer Sampere possessed reasonable suspicion that such a violation occurred. Thus, this Court will hold that the traffic stop at issue here was constitutionally valid as long as Officer Sampere had at least reasonable suspicion that a violation of Pennsylvania's Motor Vehicle Code occurred.[1]

"Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Delfin-Colina*, 464 F.3d at 396 (quoting *Wardlow*, 528 U.S. at 123). "In forming a reasonable suspicion, officers may rely on their own experience and knowledge." *United States v. Jones*, 506 F. App'x 128, 131 (3d Cir. 2012). "When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, [a court] must consider the totality of the circumstances." *Lewis*, 672 F.3d at 237.

---

[1] Further, if the traffic stop was constitutionally permissible, a violation of state law, if any occurred, would not provide a basis for suppression because "evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law." *United States v. Rickus*, 737 F.2d 360, 363-64 (3d Cir. 1984).

The traffic code Defendant was alleged to have violated, 75 Pa. C.S. § 3301(a),

provides as follows:

**(a) General rule.--**Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway except as follows:

(1) When overtaking and passing another vehicle proceeding in the same direction where permitted by the rules governing such movement.

(2) When an obstruction exists making it necessary to drive to the left of the center of the roadway, provided the driver yields the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the roadway within such distance as to constitute a hazard.

(3) When and where official traffic-control devices are in place designating a lane or lanes to the left side of the center of the roadway for the movement indicated by the devices.

(4) Upon a roadway restricted to one-way traffic.

(5) When making a left turn as provided in sections 3322 (relating to vehicle turning left) and 3331 (relating to required position and method of turning).

(6) In accordance with section 3303(a)(3) (relating to overtaking vehicle on the left).

Defendant argues that "Officer Sampere lacked the statutory authority under Pennsylvania

law to stop Mr. Langley because he observed only a momentary and minor violation that

may have been excused under the statute." (Doc. 25 at 14). Stated otherwise, Defendant's

position is that Officer Sampere observed Defendant in the left lane for less than two

minutes and the statute does not allow a police officer to stop a car based on such a short

10

period of non-compliance. (7/25/17 Hr'g Tr., Doc. 35 at 76, 83). To support his argument,

Defendant cites to *Commonwealth v. Wood*, 2016 WL 5885979 (Pa. Super. Ct. 2016).

In *Wood*, a police officer testified that he observed Wood traveling north in a

southbound lane. *Id.* at *1. Wood's passenger testified that she and Wood never traveled

on the wrong side of the road, but did make a left hand turn. *Id.* In granting Wood's motion

to suppress the evidence that was obtained after the stop occurred, the trial court found

credible the passenger's testimony "that [Wood] was attempting to make a left-hand turn; an

exception under subsection (a)(5)." *Id.* at *4. The trial court also held that "[i]f there was a

momentary and minor violation of § 3301, it was insufficient to establish probable cause for

a vehicle stop." *Id.* The Superior Court affirmed this decision, finding that

[i]n making [its] determination, the trial court necessarily credited [the passenger's] testimony that Wood was, at all times, traveling in the correct lane on the street, and he was stopped as he was making the left hand turn. Concomitantly, the court also, necessarily, discredited Officer Smith's testimony that he observed Wood traveling in the wrong lane of traffic before Wood approached the left turn.

As we stated *supra*, credibility determinations are within the sole province of the trial court. Because the trial court's factual findings are supported by the record, "we are bound by those findings." Therefore, we find no basis to disturb the trial court's suppression order

*Id.* at *5 (internal citations omitted).

Contrary to Defendant's assertion, however, nothing in the Superior Court's holding

indicates that there is a requirement that a driver must be out of compliance with § 3301(a)

for a certain period of time before a police officer may pull the vehicle over. Although the

11

trial court used the term "momentary and minor," the Superior Court's opinion simply

deferred to the lower court's factual finding that "Wood was, at all times, traveling in the

correct lane on the street, and he was stopped as he was making the left hand turn." *Id.* at

*5.

Further, other case law from the Commonwealth directly contradicts Defendant's

position. In *Commonwealth v. Enick*, 70 A.3d 843 (Pa. Super. Ct. 2013), the defendant

similarly argued that his violation of § 3301(a) "was momentary and minor and thus, did not

support a finding of probable cause to support the stop." *Id.* at 847. Comparing the

language of § 3301(a) with 75 Pa. C.A. § 3309, driving on roadways laned for traffic, the

Court disagreed. *Id.* According to the court,

§ 3309(1) of the Vehicle Code requires motorists to maintain a single lane "as
nearly as practicable." 75 Pa.C.S.A. § 3309(1). Thus, the statutory language
does not foreclose minor deviations. In comparison, § 3301 provides that "a
vehicle shall be driven on the right half of the roadway" subject to exceptions
that are not implicated in this case. 75 Pa.C.S.A. § 3301(a). The record
plainly indicates that [Defendant] violated § 3301 in this case. Since the
language of § 3301 does not include language allowing for unspecified
deviations from the rule, we need not analyze whether she complied with §
3301 "as nearly as practicable."

*Id.* (footnote omitted). Thus, because § 3301(a) does not allow for "momentary and minor"

deviations from the rule, the Court rejects Defendant's argument that Officer Sampere did

not have authority to pull Defendant over because Defendant was in the left lane for only

one to two minutes after the right lane became clear.

12

Returning to the question of reasonable suspicion, the Court finds no constitutional issues with the stop in this case. Officer Sampere testified that he observed Defendant traveling in the left lane for about a mile and a half while the right lane was clear. Section 3301(a) provides that "[u]pon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway" subject to certain exceptions. Because Officer Sampere observed Defendant traveling in a lane that was not the right half of the roadway and considering that Defendant does not advance any argument that an exception to § 3301(a) applies in this case, the Court finds that Officer Sampere possessed reasonable suspicion that Defendant was violating § 3301(a).[2] Accordingly, the Court will deny Defendant's Motion to Suppress on this basis.

---

[2] The Court notes, however, that its finding that Officer Sampere possessed reasonable suspicion that Defendant was violating § 3301(a) is not equivalent to a finding that a violation actually occurred. Indeed, an argument could be made—although Defendant makes no such argument here—that the conduct in which Officer Sampere described Defendant engaging falls within one of the exceptions to § 3301(a). Nevertheless, even assuming Defendant's driving did not violate § 3301(a), it would not change this Court's holding for three reasons. First, Defendant concedes that, pursuant to § 3301(a), "a police officer may cite a driver for driving in the left lane of a two-lane highway, unless the driver is passing another vehicle, there is an obstruction or traffic control-device in the right lane, or when making a left turn." (Doc. 25 at 13). Second, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place." *Delfin-Colina*, 464 F.3d at 398. Here, Officer Sampere testified that Defendant was traveling in the left lane when the right lane was clear of traffic. (7/25/17 Hr'g Tr., Doc. 35 at 13). Because the statute concerns limitations on when a driver may drive in the left lane, and keeping in mind the very low standard of suspicion applicable in this case, the Court finds that Officer Sampere possessed reasonable suspicion that a violation of § 3301(a) occurred. Third, even assuming there was no reasonable suspicion that Defendant violated § 3301(a), there was certainly reasonable suspicion that Defendant violated a provision the Pennsylvania Motor Vehicle Code. "When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973); *see also Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002); *Knight v. Jacobson*, 300 F.3d 1272, 1275 n.2 (11th Cir. 2002). Here, the conduct Officer Sampere described clearly violates 75 Pa. C.S. § 3313(d):

13

## B. Extension of the Traffic Stop

Next, Defendant argues that even if the initial traffic stop was valid, it was unlawful

for Officer Sampere to extend the traffic stop in order to conduct a canine inspection of the

car. (Doc. 25 at 14-18). "[A] seizure lawful at its inception can nevertheless violate the

Fourth Amendment because its manner of execution unreasonably infringes possessory

interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"

*United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).

With respect to traffic stops, "[a]uthority for the seizure . . . ends when tasks tied to the traffic

infraction are—or reasonably should have been—completed." *Rodriguez v. United States*,

135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015). "An officer . . . may conduct certain

unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way

that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify

**(d) Driving in right lane.--**

> (1) Except as provided in paragraph (2) and unless otherwise posted, upon all
> limited access highways having two or more lanes for traffic moving in the same
> direction, all vehicles shall be driven in the right-hand lanes when available for
> traffic except when any of the following conditions exist:
>
> > (i) When overtaking and passing another vehicle proceeding in the same
> > direction.
> >
> > (ii) When traveling at a speed greater than the traffic flow.
> >
> > (iii) When moving left to allow traffic to merge.
> >
> > (iv) When preparing for a left turn at an intersection, exit or into a private
> > road or driveway when such left turn is legally permitted.

Thus, because there was reasonable suspicion at the time of the stop that Defendant violated a provision of
the Pennsylvania Motor Vehicle Code, the stop does not offend the Constitution.

detaining an individual." Id. at 1615. Nevertheless, during a traffic stop, "an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003).

Here, an initial seizure occurred when Officer Sampere stopped Defendant's car. As discussed above, that seizure was justified on the basis of Officer Sampere's reasonable suspicion that Defendant violated Pennsylvania's Motor Vehicle Code. Authority for that seizure ended, however, when Officer Sampere issued Defendant a traffic citation. Rodriguez, 135 S. Ct. at 1614. Nevertheless, the seizure was prolonged—or an independent second seizure began—when Officer Sampere asked Defendant several more questions, had him step out of his vehicle, patted him down, and used a dog trained in the detection of narcotics to sniff the outside of the vehicle. Defendant argues that this post-citation activity was unconstitutional because Officer Sampere did not have reasonable suspicion of criminal activity to support his additional investigations.

The Court, however, finds that there was reasonable suspicion to support Defendant's continued seizure after the traffic citation was issued. A court reviewing a reasonable suspicion determination "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Under this approach, "the whole picture . . . must be taken into

15

account," *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), and a police officer is permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person,'" *Arvizu*, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418).

Here, Officer Sampere testified to having noted several factors which raised his suspicion. First, Defendant was traveling along what Officer Sampere testified was "a well-known drug corridor for illegal narcotic transportation." (7/25/17 Hr'g Tr., Doc. 35 at 11). Second, Defendant was driving a rental car, a practice that Officer Sampere knew to be common among drug couriers. (*Id*. at 46). Third, Defendant had multiple cell phones, including a flip phone, another common practice in the drug trade according to Officer Sampere. (*Id*. at 20-21, 43). Fourth, after Defendant told the officer he was headed to Syracuse to visit family, Defendant was twice unable to identify the specific family member he was going to visit. (*Id*. at 22, 33-34). Fifth, Defendant had prior convictions for drug related offences. (*Id*. at 27). The Court is satisfied that, while "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel[,] . . . taken together they amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

Thus, at the time Defendant was issued a traffic citation, Officer Sampere had developed independent, reasonable suspicion that justified extending the seizure and

16

expanding his investigation.[3]  *See Givan*, 320 F.3d at 458.  Accordingly, the Court will deny

Defendant's Motion to Suppress on this basis.

## C. De Facto Arrest

Finally, Defendant argues that the traffic stop was extended for such a lengthy period

of time that it constituted a de facto arrest that was not supported by probable cause.  (Doc.

25 at 19-22).  An investigative stop, also known as a *Terry* stop,[4] "'must be temporary and

last no longer than is necessary to effectuate the purpose of the stop.'" *United States v.*

*Sharpe*, 470 U.S. 675, 684, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (quoting *Florida v.*

*Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion)).  "If

an investigative stop does not meet the brevity requirement, it may be transformed into a de

facto arrest." *Briscoe v. Jackson*, 2 F. Supp. 3d 635, 642 (E.D. Pa. 2014).  "In certain

circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only

reasonable suspicion, and a de facto arrest, which must be supported by probable cause."

*United States v. Johnson*, 592 F.3d 442, 447-48 (3d Cir. 2010).  "Obviously, if an

---

[3] Relatedly, there is no indication that anything that Officer Sampere did before issuing the traffic citation impermissibly delayed the traffic stop.  For example, not too long after the initial stop, Officer Sampere called for a canine unit.  (7/25/17 Hr'g Tr., Doc. 35 at 29).  Even assuming this call occurred before the officer developed the reasonable suspicion which justified prolonging the seizure, there is no indication that the act of requesting the canine unit delayed the stop in any respect.  Indeed, Officer Sampere testified that he was completing other tasks while he was requesting the canine unit so as not to delay the traffic stop.  (*Id.* at 30-31, 47-48).

[4] The name "*Terry* stop" is derived from the seminal case *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), in which "the Supreme Court held that brief investigative stops were 'seizures' subject to Fourth Amendment protection, and that a police officer may conduct such a stop only if the officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Terry*, 392 U.S. at 21).

17

investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe,* 470 U.S. at 685. Nevertheless, there is "no rigid time limitation on *Terry* stops." *Id.*

"In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686. "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.*

Here, Defendant was initially stopped at 7:48 p.m. (7/25/17 Hr'g Tr., Doc. 35 at 17, 47; Gov't Ex. 3). After talking with Defendant briefly, Officer Sampere began to perform a variety of activities that are normally incident to a traffic stop such as writing out the citation, inspecting Defendant's driver's license, and checking Defendant's criminal history. *See Rodriguez,* 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (alteration in original) (internal citation omitted) (quoting *Illinois v. Caballes,* 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005))); *Mosley,* 454 F.3d at 264 (noting

18

that a "computer criminal history check" was a "legitimate purpose[ ] of the [traffic] stop.");
*United States v. Fraguela-Casanova*, 858 F. Supp. 2d 432, 445 (M.D. Pa. 2012) ("The court
recognizes that an officer may run a computer criminal history during a lawful traffic stop.").
Officer Sampere also investigated whether the rental agreement that Defendant produced
was valid, a reasonable activity equivalent to "inspecting the automobile's registration and
proof of insurance" which "serve[s] the same objective as enforcement of the traffic code:
ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S.
Ct. at 1615.

Officer Sampere then issued Defendant a traffic citation, explained it to Defendant,
and ended the traffic enforcement portion of the seizure somewhere around 8:30 p.m.
(7/25/17 Hr'g Tr., Doc. 35 at 32, 34, 37-38, 48-49; Gov't Ex. 3). As discussed previously,
Officer Sampere developed reasonable suspicion of criminal activity by this time and was
entitled to investigate his suspicions. His investigation consisted of asking Defendant a few
questions and having a dog perform an open air sniff of the outside of Defendant's vehicle.
(7/25/17 Hr'g Tr., Doc. 35 at 34-36, 39-40). After the dog alerted to the vehicle, indicating
the presence of narcotics, Officer Sampere informed Defendant he was free to leave. (*Id.* at
40). When Defendant informed the officer he had no one to pick him up, Officer Sampere
called Defendant a taxi cab at 8:53 p.m. (*Id.* at 40, 49; Gov't Ex. 3). When it was
determined that the taxi cab would take too long to arrive, another officer drove Defendant
to a nearby hotel. (7/25/17 Hr'g Tr., Doc. 35 at 40-41, 49; Gov't Ex. 3).

19

On these facts, the Court finds that no de facto arrest occurred. Defendant was never handcuffed or restrained in any way. (7/25/17 Hr'g Tr., Doc. 35 at 41). During the traffic enforcement portion of the seizure, Officer Sampere made reasonable inquiries incident to a traffic stop. While the traffic stop was lengthy—around forty minutes—much of the delay was attributable to factors outside of Officer Sampere's control, such as his call to Enterprise being dropped. See United States v. Byrd, 679 F. App'x 146, 149-50 (3d Cir. 2017) (finding a thirty-nine minute seizure reasonable when there was no evidence that the officer failed to act diligently during the traffic stop). After the traffic citation was issued, Officer Sampere promptly pursued his reasonable suspicion of criminal activity. Once it was clear that Officer Sampere was going to seize the vehicle—approximately one hour after the initial stop and approximately twenty minutes after Defendant was issued a citation—the officer made arrangements for Defendant to leave the scene. Although it took some additional time for Defendant to physically leave the scene, the police were no longer seizing Defendant after this time.

In sum, the evidence shows that Officer Sampere worked diligently to pursue his investigation and conclude the seizure. Accordingly, because no de facto arrest occurred, the Court will deny Defendant's Motion to Suppress on this basis.

## V. CONCLUSION

For the reasons outlined above, this Court will deny Defendant's Motion to Suppress Evidence and Statements. A separate Order follows.

Robert D. Mariani
United States District Judge